IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:09CR3010 |
| | ) | |
| V. | ) | |
| | ) | MEMORANDUM AND ORDER |
| JEDIDIAH JOEL RIEKENBERG, | ) | |
| | ) | |
| Defendant. | ) | |

The defendant has moved to suppress all evidence arising from the alleged illegal entry into his apartment by officers of the Lincoln Police Department on December 7, 2008. The defendant claims the officers violated his Fourth Amendment rights by entering the apartment without defendant's consent, and in the absence of exigent circumstances. He further claims information obtained during this alleged illegal entry was later used to obtain a warrant to search the apartment, and any evidence found during execution of the search warrant must be suppressed as fruit of the prior illegal entry. Finally, the defendant claims he was in custody and questioned after the officers entered the apartment, and defendant's responsive statements must be suppressed under the Fifth Amendment. (Filing No. 24). For the reasons discussed below, the defendant's motion to suppress will be denied.

FINDINGS OF FACT

The evidentiary hearing on defendant's motion to suppress was held before Magistrate Judge Piester on May 15, 2009. Judge Piester cannot issue a report and recommendation of his factual findings and legal conclusions at this time. After conferring with counsel, and with their approval, defendant's motion to suppress will

be resolved by me based on the record developed before Magistrate Judge Piester. Filing No. 49. The following sets forth my factual findings based on that record.

At approximately 1:52 a.m. on December 7, 2008, a woman identifying herself as Kendra Hansen reported to the Lincoln Police Department ("LPD") that her ex-boyfriend and the father of her daughter, defendant Riekenberg, was threatening to commit suicide. Ms. Hansen and her daughter were located in Grand Island, Nebraska when the report was made. Ms. Hansen stated Riekenberg had contacted her by telephone and told her he had a gun and intended to kill himself. Ms. Hansen had reportedly received an email from the defendant with a photograph depicting Riekenberg pointing a gun to his head. According to Ms. Hansen, the defendant warned that if he saw police, it was over. Ms. Hansen further stated she believed she heard the sound of a gun cock during the phone call.

Dispatch relayed Ms. Hansen's report to LPD Northeast Team officers Richard Roh; Justin Roach and his recruit officer, Wendy Hollmann; Jeffrey Hanson and his recruit officer, Officer Pulec; and Officers Howard, Ernst, and Schmidt. The officers were instructed to proceed to the defendant's residence, an apartment located near 51st and Huntington Streets in Lincoln, Nebraska, to perform a mental health investigation of Jedediah Riekenberg. Officer Roh was familiar with the defendant because he had responded to the same address on September 26, 2008, to investigate a report that defendant was threatening suicide.

The LPD officers immediately responded to the dispatch and arrived at the defendant's apartment building within two or three minutes. The defendant's apartment, located on the third floor of the building, had an entry door and patio door located on the east side. An exterior stairway on the east side provided the only means for entering or leaving the apartment. Since the defendant reportedly had a weapon, the officers divided into three or four teams and formed a perimeter on the

2

east side of the apartment building for their safety and the safety of others.  As explained by Officer Roh, an experienced officer, "if someone's suicidal, they're also homicidal, which means that they're willing to take one life, even if it's theirs, so that raises the threat level for everyone involved, officers included."  (Filing No. 47 (transcript), at CM/ECF p. 67).  With the perimeter was in place, the defendant was unable to leave the apartment without being observed by at least one of the officers.

Sergeant Michon Morrow, who was assigned to the LPD Northeast Team, was located in downtown Lincoln when she heard the dispatch report.  Since a gun was reportedly involved, and Sergeant Morrow carried the Northeast Team's ballistics shield in her vehicle, Sergeant Morrow proceeded to the defendant's location with lights and sirens, arriving approximately five minutes after the dispatch report was announced.

Sergeant Morrow delivered the ballistics shield for the officers' use, if needed, when approaching the apartment and the defendant.  She then parked her vehicle on 51st Street, about a block away from the defendant's apartment.  At approximately 2:01 a.m., Sergeant Morrow used her cell phone to call Ms. Hansen. See, ex. 102.  Sergeant Morrow asked Ms. Hansen if anything had changed since Ms. Hansen reported the defendant's suicide threat.  Ms. Hansen responded that the defendant had tried to call her again, but she had not answered the phone.

Sergeant Morrow then contacted the defendant by telephone, explained she was responding to a report of his intent to commit suicide, and engaged the defendant in conversation for approximately ten minutes.  Sergeant Morrow relayed the content of the dispatch report.  The defendant claimed Ms. Hansen had made up the story because she was trying to get the defendant arrested on a pending warrant.  Sergeant Morrow was not aware of any pending warrant at that time, but later determined it was a warrant on an unpaid misdemeanor violation.  The defendant denied being suicidal or possessing a gun, and expressed distrust and concern due to his prior bad

3

experiences with the police.  Sergeant Morrow responded that her biggest concern was his mental health and the safety of others, not any outstanding arrest warrant that may exist.  She warned the defendant that if he left his apartment, he would be detained and handcuffed, but she promised he would be given an opportunity to talk to her and explain his side of the story.

Ultimately, the defendant agreed to exit his apartment.  When the defendant stated he was leaving his apartment, Sergeant Morrow activated her microphone so the officers at the scene could hear her side of the conversation, and while continuing to speak to the defendant, she repeated and confirmed the defendant's statement that he was immediately leaving his apartment.  The officers located in the perimeter around the apartment were thereby notified that the defendant was exiting the apartment, and Sergeant Morrow began to walk toward the apartment to meet with the defendant.

The defendant left the apartment with his cell phone, locked the apartment door, and was immediately commanded to show his hands and then place them behind his back.  The defendant complied and descended the stairs.  Each of the officers in the perimeter had either a service weapon or long rifle drawn while the defendant was walking down the stairs. When the defendant reached the bottom, three or four officers surrounded him, and he was asked if he had a gun.  The defendant said, "No."  The defendant was pat searched.  Nothing was found.  Officer Hollmann then handcuffed the defendant at approximately 2:19 a.m.  See, ex. 102.

The defendant asked for Sergeant Morrow, who had just arrived at the location. Sergeant Morrow introduced herself and asked if anyone else was in the apartment, and if there was anyone hurt or in need of help located within the apartment.   The defendant said, "No."   Sergeant Morrow asked if the officers could check the apartment to confirm no one else was present.  The defendant responded that his keys were in his right pocket.  The defendant then asked what the officers intended to look

for in the apartment.  The officers explained they were looking for people because they were concerned that someone else may be present and perhaps injured in the apartment.  The defendant asked to accompany the officers into the apartment. Sergeant Morrow granted this request.  The defendant never refused to allow the officers to enter the apartment.

Since the defendant remained in handcuffs, an officer removed the apartment keys from the defendant's right pocket.  Sergeant Morrow, the defendant, and Officers Roach, Roh, Schmidt, and Hollmann ascended the stairs, with the defendant toward the front of the group.  After the apartment door was unlocked, the defendant entered the apartment with Sergeant Morrow and Officers Roh and Hollmann. Officers Roach and Schmidt remained just outside the door.

The apartment was small, with only two bedrooms.  The entry door opened into the living room, which had two couches, a coffee table, a computer, and a television. The two bedrooms, a bathroom ,and the kitchen were located to the right (west) as the officers entered the apartment.  See, ex. 101.  An officer briefly entered each of the rooms to look around and confirm no one else was in the apartment.  This brief search lasted only 30 to 45 seconds.

Once a couch was searched for weapons, the defendant was allowed to sit down.  Sergeant Morrow spoke with the defendant, reminded him that she had promised to listen to his version of the events, and asked if he wanted to talk to her at that time.  The defendant was not advised of his Miranda rights while seated in the apartment and questioned by Sergeant Morrow, and later by Officer Roach.

The defendant began to thoroughly explain the history of his relationship with Kendra Hansen.  His demeanor vacillated from distraught to animated to calm.  He was verbose, sometimes speaking rapidly and sometimes slowly.  The defendant remained in handcuffs throughout the conversation.

5

The defendant denied threatening to commit suicide. Sergeant Morrow asked him several times about the picture reportedly sent to Ms. Hansen depicting the defendant pointing a gun to his head. The defendant repeatedly denied having sent such a picture.

Shortly after 2:30 a.m., Officer Roach called Officer Hansen and asked him to contact Kendra Hansen and question her about her report to the police. Officer Hansen was not, at that time, present at the scene of defendant's apartment, having left to carry out other duties once the protective sweep was complete. Officer Hansen called Ms. Hansen and asked her to explain why she called the police. Ms. Hansen stated she received an instant message from the defendant at around 12:30 or 1:00 a.m. asking her to call him. Ms. Hansen stated she called the defendant and they discussed his concern with her moving to Grand Island with their daughter. Ms. Hansen stated the defendant called her later and was threatening suicide. Officer Hansen asked Ms. Hansen to forward the email and picture she reportedly received from the defendant to Officer Hansen's computer. Ms. Hansen complied. Officer Hansen received the forwarded email at 2:40 a.m. See, ex. 3. The email stated " if I see police it's gonna be OVER." Attached to the email was a photograph of the defendant pointing a gun at his head with the muzzle at his right cheek. See, ex. 1. Officer Hansen reported the information received from Ms. Hansen to Officer Roach.

Officer Roach entered the defendant's apartment and told him about Ms. Hansen's statement and the forwarded information. Riekenberg told Officer Roach and Sergeant Morrow that the picture received by Ms. Hansen was not current, but had been taken at an earlier time and saved in the defendant's computer. Officer Roach asked if he could search the defendant's computer and look for the photograph. Although the defendant wanted to operate the computer himself, he was still in handcuffs. The defendant agreed to allow the officer to operate the computer. Riekenberg moved three to four feet to position himself in a location where he could watch the officer and provide instructions on how to find the image.

6

When Officer Roach moved the computer mouse to begin his search, the previously dark monitor screen was illuminated and revealed an instant message, the content of which was identical to the email forwarded by Ms. Hansen to Officer Hansen.

With the defendant's assistance, Officer Roach located the saved image in the computer. Sergeant Morrow and Officer Roach observed the photograph on the computer monitor and noticed the defendant was currently wearing the same shirt depicted in the photograph. When the defendant was asked about the shirts, he became visibly agitated and stated he wears the same clothes all the time.

The defendant asked for a glass of water. Since the defendant was still handcuffed, he could not retrieve a glass from a kitchen cupboard or turn on a faucet without the officers' assistance. Officers Roh and Hollmann escorted the defendant to the kitchen. When the kitchen light was turned on, Officer Roh spotted two small bags of marijuana on the kitchen countertop. The defendant immediately positioned his body to hide the marijuana and stated he did not want the officers in the kitchen. The defendant left the kitchen without getting a glass of water.

One of the officers asked for consent to search the apartment to look for a firearm. The defendant denied consent to search, stating the officers would need to obtain a warrant. The  apartment was not searched at that time.

After personally speaking with the defendant, and having accumulated additional information from Ms. Hansen and the defendant's computer, Sergeant Morrow determined the defendant was clearly at risk, and he was placed in emergency protective custody at 3:10 a.m. See, ex. 102. The officers exited the apartment with the defendant and locked the apartment. Officers Roach and Hollmann transported the defendant to the Lincoln Crisis Center. During the transport, Officer Roach was notified that the defendant was a convicted felon. Prior

to this notification, the responding officers did not know the defendant had a criminal record.

As Officer Roach was leaving the Crisis Center, a staff person stopped him. The staff person reported overhearing the defendant on the telephone saying something to the effect of "Go get it. Go get it. It's in my apartment by my bed." (Filing No. 47 (transcript), at CM/ECF p. 88).   Officer Roach contacted Officer Schmidt and advised Officer Schmidt to return to the apartment and make sure no one entered or left.   Officer Roh assisted Officer Schmidt in securing the apartment.

Officer Roach and Sergeant Morrow prepared a warrant application and presented it to Lancaster County Court Judge Mary Doyle.   The application included an explanation of Ms. Hansen's report to LPD; stated the defendant had shown Officer Roach a picture of the defendant holding a gun to his head, and that during the investigation of defendant's threatened suicide, two baggies of marijuana were seen in the defendant's apartment; the defendant is a convicted felon; and after arriving at the Crisis Center, a staff person overheard the defendant telling an unknown party to "get it, get it out of my apartment, it's by the bed in my bedroom." Ex. 2, p. 2.

Based on the warrant application, Judge Doyle issued a warrant to search the defendant's apartment for firearms, ammunition, and firearm-related accessories; and for controlled substances, drug paraphernalia, drug packaging materials, and evidence of occupancy or residency.   Ex. 2, p. 3.

Officer Roach returned to the defendant's apartment with the warrant.   Since the warrant did not authorize a nighttime search, the officers waited until 7:02 a.m. to begin the search.   After Officer Roach read the warrant aloud, officers entered the apartment and executed the search warrant.   Incriminating evidence was found.   Ex. 2, p. 4.

LEGAL DISCUSSION

A.    <u>Fourth Amendment</u>.

The defendant claims his Fourth Amendment rights were violated when the officers entered his apartment without a warrant, and that all evidence found as a result of this alleged illegal entry must be suppressed. Specifically, the defendant claims he did not consent to the entry into his apartment, and there were no exigent circumstances justifying that entry.

Generally, a warrant is required for entry and search of a home. However, a valid consent to search is an exception to the Fourth Amendment warrant requirement. A consent to search is voluntary if it is the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied. <u>United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990)</u> (citing <u>Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973))</u>.

> A court determines whether consent is voluntary under the totality of the circumstances. The Government . . . must show that the defendant behaved in such a manner that the officer reasonably believed that the search was consensual. In evaluating the reasonableness of the officer's belief, we consider the characteristics of the person consenting, including the party's age, intelligence and education, whether he was under the influence of drugs or alcohol, whether he was informed of his right to withhold consent, and whether he was aware of rights afforded criminal suspects. We also consider the environment in which the alleged consent took place, specifically (1) the length of time he was detained; (2) whether the police threatened, physically intimidated, or punished him; (3) whether the police made promises or misrepresentations; (4) whether he was in custody or under arrest when the consent was given; (5) whether the consent occurred in a public or a secluded place; and (6) whether he stood by silently as the search occurred.

9

U.S. v. Barnum, 564 F.3d 964, 969 (8th Cir. 2009) (quoting United States v. Esquivias, 416 F.3d 696, 700 (8th Cir. 2005).

Based on the evidence of record, the defendant did not expressly state the officers could search his apartment. However, the issue is whether a reasonable officer under the circumstances would have interpreted Riekenberg's conduct and statements as expressing a consent to search. Consent may be inferred from not only statements, but also gestures and conduct. U.S. v. Jones, 254 F.3d 692, 695 (8th Cir. 2001).

When Sergeant Morrow asked if the officers could enter the defendant's apartment, the defendant stated the key was in his right pants pocket. He then asked what the officers were looking for, and when told they wanted to confirm no one else was present in the apartment, the defendant stated he wanted to accompany the officers into the apartment. The defendant never said the officers could not enter the apartment; rather he placed a condition–his presence–on that entry. Viewed in the totality, a reasonable officer would have believed the defendant was agreeing to allow the officers to enter his apartment provided the defendant was with them, and any limitation on that consent applied to the scope of the search conducted once the officers entered, not whether they could enter. See e.g., U.S. v. Fleck, 413 F.3d 883, 892 (8th Cir. 2005)(holding the act of handing the officers a key to his bedroom indicated the defendant was consenting to a search of his bedroom); U.S. v. Ware, 890 F.2d 1008, 1011 (8th Cir. 1989) (holding the officers were reasonable in believing the defendant consented to a search of his storage shed where the defendant consented to a complete search of his apartment, handed the officers a key ring that included the key to an adjacent storage shed, and never told the officers they could not search the shed). See also, U.S. v. Genao, 281 F.3d 305, 310 (1st Cir. 2002)(holding the defendant consented to the search of his apartment where he freely stated he had a key to the apartment and showed police how to use it).

10

The defendant may be arguing that any consent to search given was involuntary.  However, the defendant was an English-speaking adult who had previously talked extensively with Sergeant Morrow, and of his own volition, had exited his apartment.  When he reached the base of the stairs, he promptly asked for Sergeant Morrow.  Although he was handcuffed and surrounded by officers when asked for consent to enter the apartment, the defendant's response included asking the officers to explain why they wanted to enter his apartment, and then stating he would accompany the officers if they entered the apartment.  Under such circumstances, a reasonable officer would not have believed the defendant was merely acceding to the officers' demands.  The defendant may have been emotionally distraught, but he was not intimidated by the officers' presence or unable to engage his mental faculties to make a conscious decision.  The defendant had been handcuffed for only a moment before consent was requested, had been told he would be handcuffed if he exited his apartment, and was told the handcuffs were for safety and not to execute a warrant for the defendant's arrest.  The defendant had no reason to be surprised, or feel deceived, mislead, or facing prosecution when his consent was requested.  The officers did not threaten or punish the defendant, and no promises were made to elicit defendant's consent to enter the apartment.  Once the officers entered the defendant's apartment, consistent with the scope of defendant's consent, they looked only for persons who may be present within any room.  The entire cursory search took less than a minute.  The defendant never objected to the officers' movements within his apartment.  He denied their request for consent to search for a weapon.  Based on the totality of the circumstances presented, a reasonable officer would have believed the defendant had voluntarily consented to allow LPD officers to enter his apartment and conduct a cursory search for any persons who may be present.

Since I find the entry into defendant's apartment was consensual, I need not address whether exigent circumstances justified the warrantless entry.  The court notes, however, that the LPD officers were dealing with a non-arrest situation, the defendant had left the apartment, and he did not possess a weapon while standing

11

outside.  In non-arrest situations, once the person's access to weapons is ruled out, a warrantless, nonconsensual protective sweep of a home is justified only if officers reasonably believe others are present in the home.  U.S. v. Waldner, 425 F.3d 514, 517 (8th Cir. 2005).  Ms. Hansen did not report that anyone else was in the apartment with Riekenberg, or that anyone else resided in that home, and Ms. Hansen and her daughter were known to be in Grand Island.  The officers had no information from any other source indicating someone other than the defendant was in the apartment. No one reported hearing others in the apartment, and there were no reported gunshots or cries for help.  Although the officers had reason to believe a gun was in the apartment, the exigent circumstances exception described in Maryland v. Buie, 494 U.S. 325, 327 (1990), allows warrantless protective sweeps to look for people, not weapons or contraband.  Waldner, 425 F.3d at 517.

The defendant seeks to suppress evidence obtained when his apartment was later searched pursuant to a warrant.  The defendant claims the warrant application included evidence found as a result of the unlawful entry, and therefore the warrant is fruit of the unlawful entry.  The initial entry was not unlawful, and therefore the warrant cannot be fruit of the officers' alleged Fourth Amendment violation.

Moreover, an illegal entry will not invalidate a subsequent search warrant where information acquired as a result of the illegal entry was not necessary to the finding of probable cause supporting the warrant.  U.S. v. Packer, 730 F.2d 1151, 1156 (8th Cir. 1984).  The only evidence in the warrant application that arose from the officers' presence in Riekenberg's apartment was the observation of marijuana in the kitchen and observing the photograph of the defendant holding a gun on defendant's computer monitor.  Excluding that information, the application nonetheless supported issuance of a warrant.  Specifically, the application also stated the following:

12

- Ms. Hansen reported the defendant said he had a gun and intended to shoot himself, she heard what sounded like a gun cocking, and she saw a photograph that Riekenberg sent by email depicting Riekenberg holding a gun;

- The officers investigated the suicide threat;

- Once the defendant was at the Crisis Center, a staff person reportedly heard the defendant tell someone to go to his apartment and "get it, get it out of my apartment, it's by the bed in my bedroom;" and

- Riekenberg is a convicted felon, and was convicted on October 27, 2003, of attempt to Possess a Firearm by a Felon and Possession of a Controlled Substance.

As to the information provided by Ms. Hansen, information supplied by a citizen witness who voluntarily comes forward to aid law enforcement is considered presumptively reliable, (United States v. Ross, 713 F.2d 389 (8th Cir. 1983)), and it can certainly be inferred from the application that Riekenberg was admitted to the Crisis Center upon investigation of his alleged suicide threat, which further serves to corroborate Ms. Hansen's report .[1]  The information obtained by the officers while in the defendant's apartment was not necessary to a finding of probable cause. Without reference to the alleged illegal entry and any evidence seized or observed inside defendant's apartment, the warrant application supported a probable cause finding that defendant was a convicted felon who had possessed a gun, and the gun would likely be found upon search of his apartment.  Any evidence obtained during execution of the warrant to search the defendant's apartment will not be suppressed. See e.g., U.S. v. O'Neal,  17 F.3d 239, 243 (8th Cir. 1994) (holding that although the

---

[1]In addition, prior to issuance of the warrant, the officers had independently verified, by email from Ms. Hansen, that the defendant had sent her a picture of himself holding a gun.  The government has not, however, argued application of the inevitable discovery doctrine to the facts of this case.  I have therefore not addressed that argument.

warrant application contained information obtained from an illegal seizure of a bag, evidence obtained when the warrant was executed would not be suppressed since the application, even without the illegally obtained information, supported a finding of probable cause to search).

The defendant's claims for suppression of evidence under the Fourth Amendment are denied.

B.   <u>Fifth Amendment</u>.

The defendant seeks to suppress statements he made after being handcuffed at the bottom of the apartment stairs, and his statements to Sergeant Morrow and Officer Roach while they spoke with him in his apartment. Specifically, the defendant claims the officers violated his Fifth Amendment rights because they failed to advise him of his <u>Miranda</u> rights, and his statements were involuntary and the product of coercion.

"<u>Miranda</u> warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'  It was *that* sort of coercive environment to which <u>Miranda</u> by its terms was made applicable, and to which it is limited."  <u>United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004)</u> (quoting <u>Oregon v. Mathiason, 429 U.S. 492, 495 (1977)</u> (emphasis in original)).  "An individual is in custody when placed under formal arrest, or when his or her freedom is restricted to a degree akin to formal arrest."  <u>U.S. v. Elzahabi, 557 F.3d 879, 883 (8th Cir. 2009)</u>.  Whether Riekenberg was in custody when he was speaking with the officers turns on "whether, under the totality of the circumstances he faced at the time of his questioning, a reasonable person in his position would have felt free to end the interrogation and leave."  <u>Elzahabi, 557 F.3d at 883</u>.

There are two discrete inquiries essential to the "in custody" determination. The court must consider:  1) the totality of the historical circumstances confronting the suspect; and 2) given those circumstances, whether a reasonable person would consider his or her freedom of movement restricted to the degree associated with a formal arrest.  U.S. v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005).  The following factors should be considered when determining whether a suspect was "in custody:"

> (1)     whether the suspect was informed that he or she was free to leave or was not under arrest;
>
> (2)     whether the suspect possessed unrestrained freedom of movement during questioning;
>
> (3)     whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;
>
> (4)     whether police used strong-arm tactics or deceptive  strategies during questioning;
>
> (5)     whether the atmosphere of the questioning was police-dominated; and
>
> (6)     whether the suspect was arrested at the end of the questioning.

Elzahabi, 557 F.3d at 883; United States v. Galceran, 301 F.3d 927, 929-930 (8th Cir. 2002).   This list is not exhaustive, and no one factor is necessarily dispositive. Galceran, 301 F.3d at 930.   "Custody cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." Elzahabi, 557 F.3d at 883 (citing United States v. Czichray, 378 F.3d 822, 827-28 (8th Cir. 2004)).   Rather, the court must look at the totality of the circumstances of the encounter, keeping mindful that the determination is based "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."   LeBrun, 363 F.3d at 720

15

(quoting Stansbury v. California, 511 U.S. 318, 322-23 (1994)).   "[T]he coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart."   Elzahabi, 557 F.3d at 884.   "The most obvious and effective means of demonstrating that a suspect has not been taken into custody is an express advisement that the suspect is not under arrest and that his participation in questioning is voluntary."   Elzahabi, 557 F.3d at 883.

Before Riekenberg left his apartment, Sergeant Morrow clearly explained that the officers were responding to a report that the defendant was suicidal, and were present out of concern for the defendant's safety, and not to arrest the defendant on any outstanding warrant.  The defendant wanted to speak with Sergeant Morrow to explain his version of the events and his actions, and Sergeant Morrow promised she would listen.  Sergeant Morrow warned the defendant that when he left the apartment, he would be handcuffed to assure everyone's safety.  With this knowledge, the defendant left his apartment, and upon reaching the bottom of the stairs, promptly asked for Sergeant Morrow.  Most of the defendant's communications with the police occurred in the  defendant's own living room. The officers did not, and did not need to persuade the defendant to talk.  The defendant wanted to talk.  The officers did question the defendant about whether he had a gun and whether he had threatened to use it, but in the context of the circumstances presented and from an objective point of view, these questions were aimed at investigating the defendant's mental state and not his involvement in any crime.  The defendant was not arrested after speaking with Sergeant Morrow and Officer Roach in his apartment.  Instead, consistent with the clearly stated focus of the encounter, the defendant was placed in protective custody and transported to the Lincoln Crisis Center for his own safety.

Unquestionably, the defendant did not have "unrestrained freedom of movement during questioning." Elzahabi, 557 F.3d at 883.   He was detained from the time he exited his apartment until he was admitted into the Lincoln Crisis Center.

16

Consistent with their community caretaking functions, a police officer may need to seize and detain a person in order to ensure the safety of the individual, regardless of any suspected criminal activity. Winters v. Adams , 254 F.3d 758, 763 (8th Cir. 2001) (citing United States v. King, 990 F.2d 1552, 1560-61 (10th Cir.1993)). See also, United States v. Wallace, 889 F.2d 580, 582 (5th Cir.1989) (officers detained defendant for his own safety after being informed that he possessed gun and had threatened suicide). The defendant argues, however, that he was "in custody" for Miranda purposes from the moment he was surrounded by officers and handcuffed and throughout his conversation with officers in his apartment.

"The 'bare fact of physical restraint does not itself invoke Miranda,' (Wilson v. Coon, 808 F.2d 688, 689 (8th Cir.1987)), only that restraint which is of a 'degree associated with formal arrest.'" U.S. v. Griffin, 922 F.2d 1343, 1350 (8th Cir. 1990) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). "Handcuffing a suspect does not necessarily dictate a finding of custody. . . . Strong but reasonable measures to insure the safety of the officers or the public can be taken without necessarily compelling a finding that the suspect was in custody." U.S. v. Booth, 669 F.2d 1231, 1236 (9th Cir. 1981).

Although Riekenberg was placed in handcuffs and not free to leave when asked about possessing a gun, and during his conversation with Sergeant Morrow and Officer Roach in the defendant's apartment, under the totality of the circumstances presented, a reasonable person in the defendant's position would know the handcuffs and his restricted movement had nothing to do with a formal arrest, but were imposed as a safety precaution while the officers attempted to determine if the defendant was truly a risk to himself or others and in need of protective custody. Applying the factors described in Elzahabi in the context of the historical circumstances confronting Riekenberg at the time, despite being in handcuffs, the defendant was not "in custody" for Miranda purposes when he spoke with the LPD officers on December 7, 2008.

17

Moreover, even assuming the defendant was in police custody on December 7, 2008, his statements to the officers were not the result of "interrogation," and any questioning falls within Miranda's "public safety" exception.   "To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cty., 124 S.Ct. 2451, 2460 (2004).   "Interrogation," as conceptualized in Miranda, "must reflect a measure of compulsion above and beyond that inherent in custody itself." Rhode Island v. Innis, 446 U.S. 291, 300 (1980).  In deciding whether particular police conduct is interrogation, the court must be mindful that the purpose of Miranda is to prevent "government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." Arizona v. Mauro, 481 U.S. 520, 529-30 (1987).   Statements voluntarily made by a defendant while in custody are not protected by the Fifth Amendment or the exclusionary principles of Miranda, (Butzin v. Wood, 886 F.2d 1016, 1018 (8th Cir. 1989) (quoting United States v. Rhodes, 779 F.2d 1019, 1032 (4th Cir. 1985)), and Miranda warnings are not required before asking questions necessary to protect the public or the police from immediate danger.   New York v. Quarles, 467 U.S. 649, 655 (1984).

After the defendant left his apartment and  reached the bottom of the stairs, he was surrounded by officers, pat searched, and handcuffed.  The defendant was asked if he had a gun and if anyone else was present in the apartment and/or in need of assistance.  The defendant responded, "No," to these questions.  Even assuming the defendant was in custody at the time, and that his responses to the officers' questions were incriminating, the questions were aimed at safeguarding the public.  Asking the defendant, upon first contact, if he possessed a gun, and if anyone else was in his apartment who may have access to a gun or may need assistance , clearly falls within the Quarles public safety exception to the Miranda requirements.  See, New York v. Quarles, 467 U.S. 649, 655 (1984) (establishing the public safety exception to Miranda and refusing to suppress a defendant's response to the officer's post-arrest question, "Where is the gun?").

The conversation with Sergeant Morrow in the defendant's apartment began because the defendant had asked for an opportunity to explain his version of the events while speaking with Sergeant Morrow on the telephone. Once a protective search of the apartment was complete, and the defendant had been pat searched and handcuffed, Sergeant Morrow reminded the defendant that she remained willing to listen and asked if he wanted to talk at that time. Despite any temporal gap between when the defendant expressed his desire to talk with Sergeant Morrow and when that conversation began, the defendant's conversation with Sergeant Morrow was actually initiated at the defendant's request. Based on the defendant's demeanor and the content of his conversation, a reasonable officer in Sergeant Morrow's position would have concluded the defendant was not only freely, but eagerly, initiating a conversation with the officer. Considering the totality of Sergeant Morrow's encounter with the defendant on December 7, 2008, the defendant's conversation with Sergeant Morrow, particularly as it pertains to the history of his relationship and communications with Ms. Hansen, was voluntary and not made in response to interrogation.

While speaking with the officers in his apartment, the defendant was trying to dispel any notion that he had actually threatened suicide. As part of their community caretaking responsibilities, law enforcement agencies investigate reports of threatened suicide, and if an allegedly suicidal person denies making any such threats, officers must try to determine the veracity of the report they received. A person intent on committing suicide may claim no such threats were made in order to avoid being placed in protective custody. Riekenberg was claiming he never threatened suicide and that Ms. Hansen had concocted and vindictively made the report so the defendant would be located and arrested on an outstanding warrant. In such circumstances, the law enforcement officers are tasked with making an on-the-spot decision regarding who is telling the truth; the person who allegedly made the suicide threat, or the person who reported it. An incorrect determination likely means either

19

a nonsuicidal person is, without justification, placed in protective custody, or a truly suicidal person is not.

In the face of Riekenberg's repeated denial that he threatened suicide, Officer Roach had Officer Hansen contact Ms. Hansen and investigate the veracity of her report. When the information received from Ms. Hansen, including the photograph of the defendant with a gun pointed at his head, fully corroborated her report, Officer Roach confronted the defendant with this information. Specifically, Officer Roach and Sergeant Morrow asked the defendant about the picture depicting the defendant holding a gun, and when the defendant stated the picture was old, asked the defendant if he had a gun, asked for assistance and information to find the image on defendant's computer, and asked the defendant to explain the fact that he was currently wearing the same shirt depicted in the photograph. The defendant claims these questions were "interrogation" because they sought and revealed incriminating evidence.

The officers' questions regarding possession of a gun were not, under the circumstances presented, "interrogation." Interrogation occurs when officers expressly question or use words or actions which "police should know are reasonably likely to elicit an incriminating response from the suspect," (Holman v. Kemna, 212 F.3d 413, 417 (8th Cir. 2000) (citing Innis, 446 U.S. at 301)), and in determining whether a statement is the product of interrogation, the focus is on the defendant's perceptions of officers' behavior at the time the statements were made. Id. at 418. The defendant was aware the officers were trying to determine if he was suicidal. Based on the evidence, the defendant had no reason to perceive the officers' questions as pursuing a criminal rather than a mental health investigation. The defendant was questioned about possession of a gun, but when this questioning was occurring, none of the LPD officers knew the defendant was a convicted felon. Possessing a firearm is not, in and of itself, a crime, and the questions were asked to determine if the defendant was contemplating or had threatened suicide, which is also not a crime. The officers' questions, considered in the context of the information

20

known by the officers as the events were unfolding, were asked to assess the defendant's mental health status, not to seek incriminating information.

Through questions posed to the defendant, the officers were trying to decide whether the defendant would pose a risk to himself or others if not taken into protective custody. In such a case, the need for answers outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination  See e.g.,  U.S. v. Webb, 755 F.2d 382, 392 n. 14 (5th Cir. 1985) (noting that assuming a psychiatrist's questions to a suspect constituted custodial interrogation, the psychiatrist's efforts to prevent the suspect's suicide were within the Quarles public safety exception). Assuming the officers' questions to determine if Riekenberg possessed a gun are deemed "interrogation," the Quarles public safety exception to Miranda applies.

The defendant claims his statements to the officers on December 7, 2008 were involuntary and must be suppressed under the Fifth Amendment. The appropriate test for determining the voluntariness of a statement is whether the statement was extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired. United States v. Astello, 241 F.3d 965, 967 (8th Cir. 2001) (quoting United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995). The court must consider the "conduct of the law enforcement officials and the capacity of the suspect to resist the pressure to confess." United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998). The government has the burden of proving by a preponderance of the evidence that Riekenberg's statements were voluntary. United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001).

Throughout his contact with LPD officers on December 7, 2008, the defendant was treated with respect. Other than a promise to listen when the defendant wanted to talk, the officers made no promises in exchange for the defendant's statements. The officers did draw weapons and surround the defendant when he exited the apartment,

21

but the defendant was fully aware, in advance, that these measures would be taken to assure everyone's safety.  The defendant may have been emotionally distraught, but he remained able make and communicate decisions he believed protected his interests.  For example, when asked for consent to search the apartment for a gun, the defendant refused.  The defendant's statements were voluntary and not the product of police coercion .

The defendant's motion to suppress his statements made to LPD officers on December 7, 2008 will be denied.

IT IS ORDERED:

1)      The defendant's motion to suppress, (filing no. 24), is denied.

2)      Trial of this case will begin at 9:00 a.m. on Tuesday, July 28, 2009 for a duration of three trial days. Jury selection will be at the commencement of trial.

June 24, 2009.                         BY THE COURT:

                                       *S/Richard G. Kopf*
                                       United States District Judge